SHELDON AND ANITA DROBNY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
DROBNY v. COMMISSIONER
Docket No. 16985-83
United States Tax Court
T.C. Memo 1995-209; 1995 Tax Ct. Memo LEXIS 210; 69 T.C.M. (CCH) 2600; May 17, 1995, Filed *210 An appropriate order will be issued denying petitioners' motion for leave to file motion to vacate. For petitioners: Harvey M. Silets and Jaye Quadrozzi. For respondent: Matthew J. Fritz and James W. Ruger. COHEN
COHEN
MEMORANDUM OPINION COHEN, Judge: Petitioners seek to vacate the decision entered June 26, 1986, pursuant to the Opinion of the Court in Drobny v. Commissioner, 86 T.C. 1326 (1986). Petitioners contend that the decision was procured by fraud on the Court engaged in by respondent's counsel and agents. Background
The factual background of this case is found in the Opinion of the Court at 86 T.C. at 1328-1339. Only facts material to the pending motion are repeated here. Petitioner Sheldon Drobny (petitioner) was an Internal Revenue Service (IRS) agent from 1967 through 1971 and began private practice as a certified public accountant in 1971. During the 1970's, petitioner began to promote tax shelters. Some of the shelters were promoted in association with Marvin Kamensky (Kamensky), who was known in Chicago, Illinois, as an attorney with experience in the formation of research and development tax shelters. *211 During 1979 and early 1980, Marc Z. Samotny (Samotny), an associate of Kamensky, prepared documents involved in the transactions that were a part of the tax shelter programs. In November 1979, petitioner was informed by Kamensky of two tax shelter programs based on a substance known as aloe vera. Kamensky and Samotny persuaded petitioner to solicit investors from among his clients and associates. Petitioner and his firm were identified in the offering materials as promoters of the program and as members of an accounting firm that specialized in financial and tax consultation. Petitioners purchased an interest in each of the two research and development programs and deducted certain amounts on their 1979 joint Federal income tax return as their share of losses resulting from the programs. On April 15, 1983, respondent sent to petitioners a statutory notice disallowing the deductions and asserting that petitioner was liable for the addition to tax for fraud. During the hearing on petitioners' presently pending motion, other facts concerning the audit and investigation of the two programs in issue and petitioner's involvement in them were developed. In 1981 or 1982, revenue agent *212 Noreen Rosen (Rosen) was assigned to conduct an audit of the programs. Another revenue agent, Irving Feinglass (Feinglass), was a member of the same management group but was not assigned to audit petitioners' return. On December 16, 1982, Rosen and Feinglass met with petitioner at petitioner's office. At that meeting, Rosen showed petitioner her report dated November 23, 1982, in which she proposed disallowing the claimed losses of the investors in the programs. Feinglass made an offer to petitioner to allow as a deduction the amount of cash paid by each participant for his or her interest in the program, with no penalties to be asserted against anyone. Petitioner did not immediately accept the offer, indicating that he would contact the investors. On January 12, 1983, Rosen forwarded to the Criminal Investigation Division a criminal fraud referral report regarding petitioner. No criminal investigation field work was performed on the criminal fraud report referral, however. Petitioner was also recommended as a target in a grand jury request that identified several Chicago area individuals involved in abusive tax shelters, but he was not approved as a target. The development *213 of the programs in issue here paralleled similar programs throughout the United States during the same period, resulting in a tremendous increase in the caseload of the IRS and this Court. From 1974 to 1984, the number of cases docketed in the Court more than quadrupled. Many of the new cases originated in the Chicago, Illinois, area. Sometime during 1983, Harmon Dow (Dow), who was then assistant district counsel in Chicago, telephoned Judge Charles R. Simpson, a judge of the Court with whom Dow was acquainted. Dow told Judge Simpson that the Chicago office had a tremendous influx of cases that, in Dow's opinion, could not be handled by the ordinary processes of the Tax Court. Dow suggested that the Tax Court should look into a different method of dealing with these cases. Judge Simpson asked Dow to send to him a computerized list of the cases, which Dow did. Approximately 2,500 cases were ultimately identified and assigned to Judge Simpson in this manner. Among the cases on the list was petitioners' case. In 15 cases other than the within case involving the aloe vera programs, taxpayers were represented by Randall S. Goulding (Goulding) as counsel of record. Lauren Gore *214 (Gore) was the attorney for respondent initially assigned to handle the cases. On December 21, 1983, Judge Simpson ordered that 15 cases, including the within case and 14 cases in which Goulding was counsel of record, be among many groups set for hearing in Chicago, Illinois, on January 16, 1984. Accompanying the notice of hearing was a memorandum from Judge Simpson stating the following: TO THE PARTIES IN CASES ON THE CALENDAR FOR THE SPECIAL REPORT SESSION OF THE COURT ON JANUARY 16, 1984, IN CHICAGO, ILLINOIS
I have been requested and directed by the Chief Judge of the Tax Court to take charge and manage the cases to be tried in the Chicago area, particularly those involving alleged tax shelters. Let me explain my objectives for this Special Report Session of the Court: Many cases that appear to be tax shelters have been set for report at this session. Some of these cases will have to be tried; others can be settled on the basis of the decisions in the tried cases. At this Special Report Session, I propose to select the cases to be tried and to develop the plans and procedures for bringing those cases to trial at the earliest possible time. I will set a Spring Session *215 of the Court for the trial of these cases to commence on April 30, 1984, in Chicago. At this Special Report Session, I will expect the parties to assist me in identifying the cases that involve similar facts and legal questions and to assist in selecting the most appropriate cases to be tried.
The procedures described in Judge Simpson's memorandum became known to respondent's counsel and to the Court as the "Chicago experiment". The group of aloe vera cases was called for hearing on January 16, 1984. Petitioners were represented by Steven B. Nagler (Nagler), and respondent was represented by Dow and William C. Sabin, Jr. (Sabin). Nagler stated that he was there also for the other taxpayers in the group of cases at the request of Goulding. Judge Simpson began by asking for an explanation of the related cases. Counsel responded as follows: MR. SABIN: This involves a research and development promotion in to [sic] two different products. All sixteen participants invested in both -- or I should say, participated in both schemes, and therefore -- and the transactions involved are similar if not identical and therefore, the government has put them both together. One of the *216 investors, Mr. -- and one of the participants, Mr. Drobny, appears to have been the promoter and as a result the government has assessed a fraud penalty against him. The government's position is that any one of these individuals should be tried and that the rest of the cases will follow the issues determined in that trial. THE COURT: Well, if Drobny involves fraud and the other doesn't, do we try Drobny or -- MR. NAGLER: Well, -- THE COURT: Pardon me? MR. NAGLER: Your Honor, we would like to try Drobny and one other. THE COURT: I see. MR. SABIN: The government has no objection to that. THE COURT: All right. Drobny and one other investor. Is that what you are saying? MR. NAGLER: That is correct. MR. SABIN: At this time, since Mr. Goulding represents all of the other investors that are not present, it is probably impossible to settle which of the other investors should be tried in addition to Drobny. MR. NAGLER: Well, but sometime during this week, he will be available, so we will just get together with Mr. Sabin and pick one out and inform -- THE COURT: And you will let me know then? MR. NAGLER: Right. THE COURT: All right. MR. NAGLER: I don't know if there is a clean *217 one [single issue], "clean one" in the group, do you? MR. SABIN: There are several clean ones, Your Honor. MR. NAGLER: Then one of those will be acceptable. THE COURT: All right. So then we will try two cases here -- two individual cases involving this shelter. MR. NAGLER: Now, Your Honor, with regard to the April 30th date, Drobny is a new case. I believe the time for even completing pleadings hasn't run yet, has it? THE COURT: Oh, is that right? MR. NAGLER: Yesterday? MR. DOW: No, we have -- the pleadings are completed. The reply has been received. MR. SABIN: Drobny is the case that has the civil fraud penalty on it, Your Honor. THE COURT: Yes. MR. NAGLER: So I don't see any reason why it can not be tried, it is just that [there] has been no discovery undertaken at this point in time. MR. SABIN: However, informal discovery has commenced and we have arranged meetings with Mr. Nagler as well as with Mr. Goulding next week, and we are fully confident that informal discovery should yield most of the information we need. THE COURT: Here you are going to have the burden of proof in Drobny -- MR. SABIN: In the fraud. THE COURT: -- at least as to the fraud, aren't you? *218 MR. SABIN: Yes, Your Honor. THE COURT: And are you telling me you think the case can be tried by -- prepared for trial by the April date? MR. SABIN: Yes, indeed, Your Honor. THE COURT: And I gather, Mr. Nagler, you are not vigorously disagreeing? MR. NAGLER: Not at all, Your Honor.
By Order dated January 24, 1984, the within case was set for trial on April 30, 1984. The case of Lifshitz v. Commissioner, docket No. 17602-83, in which Goulding represented the taxpayers, was thereafter selected as the other test case. On April 30, 1984, when the case was called, respondent disclosed to Judge Simpson in open court the pendency of the criminal investigation of petitioner. A joint oral motion for continuance was made by the parties, and the cases were continued to June 25, 1984. In May 1984, district counsel and the district director recommended and decided that the criminal investigation of petitioner would be discontinued. On May 21, 1984, Dow wrote a letter to Nagler, advising Nagler that the criminal investigation had been closed. Samotny was identified prior to April 30, 1984, as a witness to be called by petitioner and by respondent. He was present in court when *219 the announcement concerning the criminal investigation of petitioner was made. At the request of Samotny's counsel, on May 14, 1984, district counsel wrote a letter confirming a prior oral conversation with Sabin that Samotny was not a target of any investigation but was merely a witness to the transactions at issue in this case. Samotny ultimately testified at trial. Petitioners also considered calling as witnesses Kamensky and Benjamin Rosenberg (Rosenberg), one of the other investors. In Petitioners' Trial Memorandum filed June 27, 1984, however, neither Kamensky nor Rosenberg was listed as a witness. The trial commenced on June 27, 1984. On June 28, 1984, Sabin had a telephone conversation with Kamensky, who had been subpoenaed by respondent. As a result of the conversation, Kamensky consulted counsel. Counsel informed him that he should invoke the Fifth Amendment privilege and not testify. Kamensky was called as a witness by respondent on June 29, 1984. On the advice of counsel, he declined to answer any questions concerning the aloe vera research and development programs. The Court inquired into Kamensky's basis for asserting the claim under the circumstances, and *220 the following occurred: THE WITNESS: Well, there -- there are numerous ones, but two of them are, I was informed yesterday evening by Counsel for Respondent that information that I had was in conflict of information that he had which could, possibly, lead to a perjury indictment and, secondly, because of the fact that we have a number of matters before the Tax Court, and speaking to any number of people, including my Counsel, I have been informed that "Regional Counsel is out to get me."; and Your Honor, the -- the fact that they are placing me on the stand for this basis, I think, is indicative of that fact. THE COURT: Do you have any comment, Mr. Sabin, you would like to make with the result of that statement? MR. SABIN: For the record, I would like to state that I never referred to any perjury claim or suspicion in my conversation with Mr. Kamensky last night. It is true that the Government's position is that he knows something about the programs at issue in this trial. We believe he has material information about these programs. That much is clear from the record that has already been established and, indeed, the facts that have been stipulated by the Petitioners and the *221 Government. Furthermore, the Government's position is that this whole program was fraudulent, and I am forced to concur with Mr. Kamensky's position that he may be in some risk. Beyond that, I have no further comment. * * * MR. SABIN: No, there is one other comment. He -- to the best of our knowledge -- well, I would say, categorically, that he is not under any criminal investigation at this time or does one appear imminent, and this is the result of a telephone conversation with the Deputy Director, Harold Cook, as of yesterday afternoon. He is a Deputy Regional Counsel for criminal tax.
After argument by Kamensky's counsel and Dow, the Court sustained Kamensky's claim and excused him from further testimony. Rosenberg was not listed as a witness by any party prior to trial. Rosenberg was an accountant as well as an investor in the aloe vera programs. He had recommended the investment to some of his clients. Goulding had filed a petition on behalf of Rosenberg with respect to Rosenberg's investment in the aloe vera programs. Rosenberg's personal return was audited by Feinglass. Prior to trial of the within case, Feinglass came to Rosenberg's office to discuss the *222 possibility of a settlement by which he would be allowed his "out-of-pocket" payments as a deduction. When petitioner called Rosenberg and requested that he testify during trial of the within case, Rosenberg had already decided not to testify. Rosenberg told petitioner that he did not wish to testify against the IRS because he feared repercussions. In the Opinion filed June 26, 1986, 86 T.C. 1326, the Court sustained respondent's determination, including the additions to tax for fraud against petitioners. The Opinion, authored by Judge Simpson, discussed petitioner's background, his claimed reliance on Kamensky, and the specific objective facts that: clearly and convincingly indicates that Mr. Drobny knew that some or all of the research and experimental expenditures arising from the programs were not deductible and that he intentionally reported losses resulting from such claimed deductions on his 1979 income tax return, resulting in a fraudulent underpayment of tax.
Petitioner did not file a timely notice of appeal from the decision. Pursuant to sections 7481(a)(1) and 7483, I.R.C., the decision became final on September 24, 1986. In July *223 1993, Feinglass told petitioner that the criminal investigation referral would not have been made if petitioner had agreed to the deficiency in his own case and that Feinglass' second objective for the referral was to determine petitioner's involvement with Goulding. Thereafter, petitioner decided to bring the pending motion, which was filed February 18, 1994. Discussion
The context of this case requires awareness of the circumstances created by the large number of tax shelter cases arising during the late 1970's and early 1980's as a result of tax shelter programs such as those promoted by petitioner. The large number of cases led to specialized response by the IRS, by the Court, and by Congress. The trends were summarized in H. Rept. 98-861, at 985-986 (1984), 1984-3 C.B. (Vol. 2) 239-240, as follows: The conferees note that a number of the provisions of recent legislation have been designed, in whole or in part, to deal with the Tax Court backlog. Examples of these provisions are the increased damages assessable for instituting or maintaining Tax Court proceedings primarily for delay or that are frivolous or groundless (sec. 6673), the adjustment *224 of interest rates (sec. 6621), the valuation overstatement and substantial understatement penalties (secs. 6659 and 6661), and the tax straddle rules (secs. 1092 and 1256). Additionally, the conference agreement did not follow the provision of the House bill permitting certified public accountants and enrolled agents to represent a taxpayer in a small tax case because the Tax Court stated that permitting this would jeopardize the integrity of the small tax case process, which is working well. The conferees believe that, with this amendment, the Congress has given the Tax Court sufficient tools to manage its docket, and that the responsibility for effectively managing that docket and reducing the backlog now lies with the Tax Court. The positive response that the Court has made to several recent GAO recommendations is encouraging and the conferees expect the Court to implement swiftly these and other appropriate management initiatives. The conferees also note favorably the steps the Court has begun to take in consolidating similar tax shelter cases and dispensing with lengthy opinions in routine tax protestor cases. The Court should take further action in these two areas, as well *225 as to assert, without hesitancy in appropriate instances, the penalties that the Congress has provided. The Internal Revenue Service also has significant responsibilities in reducing the Tax Court backlog. The Service's settlement policy should be fair and flexible, and only appropriate cases should be litigated. Although in the recent past the Service has offered to settle many tax shelter cases by permitting taxpayers to deduct out of pocket expenses, the Service no longer routinely offers this as a settlement. This is a constructive change in policy, in that a taxpayer should not expect to be able to deduct out of pocket expenses regardless of the circumstances of his case. The Service should assert, without hesitancy in appropriate circumstances, the penalties that the Congress has provided. In particular, the negligence and fraud penalties are not currently being applied in a large number of cases where their application is fully justified. The conferees note with approval the steps the Service has recently taken to eliminate the backlog in the Appeals Division.
The Tax Court Reports, including specifically the volume in which the Court's 1986 Opinion in this case *226 appears, reflect the large number of Tax Court cases tried and submitted to the Court during that era. Reported cases also reflect Goulding's continuing troubles with the U.S. Government and his attempts to blame many of his problems on Feinglass. See Goulding v. United States, 957 F.2d 1420 (7th Cir. 1992); Goulding v. Feinglass, 811 F.2d 1099 (7th Cir. 1987); Goulding v. Commissioner, T.C. Memo. 1988-212, affd. without published opinion 928 F.2d 1135 (7th Cir. 1991). Petitioner also has had continuing controversy with the IRS. See Adler & Drobny, Ltd. v. United States, 9 F.3d 627 (7th Cir. 1993). The crux of petitioners' present complaint is stated in their brief as follows: Throughout the course of their preparation for the trial of Drobny v. Commissioner, Respondent's attorneys and agents engaged in a knowing and deliberate plan to prevent Petitioners from fully and fairly defending themselves at trial. In furtherance of their plan, Respondent's attorneys and agents (1) manipulated facts, circumstances and people -- *227 to the end of intimidating the Petitioners' critical witness into not testifying; (2) intimidated yet another potential witness on behalf of Petitioners into not testifying; and (3) violated audit and investigation procedures in an effort to force Petitioners to settle, and when that failed, manipulated facts and circumstances to cause an unfounded -- and ultimately entirely dormant -- criminal investigation of Mr. Drobny to be commenced.
Petitioners contend that the conduct complained of constituted a fraud on the Court and that the decision, otherwise final, should be vacated in accordance with Toscano v. Commissioner, 441 F.2d 930 (9th Cir. 1971), revd. and remanded 52 T.C. 295 (1969); and Kenner v. Commissioner, 387 F.2d 689 (7th Cir. 1968), in which a taxpayer sought to vacate 318 F.2d 632 (7th Cir. 1963), affg. T.C. Memo. 1961-37. Because of the passage of time, each of the witnesses at the hearing in November 1994, other than petitioner, indicated some lack of recollection of the sequence of events and specific conversations that *228 petitioner alleged to have occurred. Feinglass denied statements that had been attributed to him by IRS personnel investigating complaints brought against him by Goulding. Petitioners caused a writ of habeas corpus to be issued by the Court to secure the appearance of Goulding, who was imprisoned as a result of his criminal conviction; after he appeared, petitioners decided not to call Goulding as a witness. Rosenberg did not recall specific statements attributed to him by petitioner. Neither Nagler nor respondent's attorneys involved in the case recalled specific sequences of events, notwithstanding the written record available to all of them. Some of the events that petitioner now suggests were unfair to him, such as expedited trial of his case, were specifically suggested or agreed to by Nagler, as appears from the transcript quoted above. Although petitioner suggests that the initial contact between Dow and Judge Simpson was somehow designed to prejudice his rights, there is no indication that Judge Simpson had any information about this specific case prior to the hearing in January 1984, when the parties explained the circumstances to him. Petitioners have neither shown *229 nor cited any specific examples of false statements, willful concealment, or other misrepresentations by respondent's counsel or other agents. Although they refer to a plan or conspiracy, they have not cited any violations of law or ethical restrictions by respondent's counsel. They have not even alluded to the pertinent Model Rules of Professional Conduct (1994). For example, Rule 3.4 provides: A lawyer shall not: (a) unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act; (b) falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law; (c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists; (d) in pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party; (e) in trial, allude to any matter that the lawyer does not reasonably believe *230 is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused; or (f) request a person other than a client to refrain from voluntarily giving relevant information to another party unless: (1) the person is a relative or an employee or other agent of a client; and (2) the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information.
Rule 4.2. provides: In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.
We have considered the evidence with regard to those rules, which are applicable to counsel appearing in cases before us. See Rule 201(a), Tax Court Rules of Practice and Procedure.
Petitioners specifically complain that they were "prevented *231 from offering the testimony of two critical witnesses"--Kamensky and Rosenberg. Neither had been identified as a witness in Petitioners' Trial Memorandum. Both witnesses were well known to petitioners and their counsel prior to trial. At the hearing on the pending motion, Rosenberg testified that, before he was contacted by petitioner about testifying in this case, he decided that he did not wish to testify against the IRS. He did not recall telling petitioner that he declined to testify because of implied threats by Feinglass. Petitioners contend that Feinglass offered a settlement to Rosenberg if he would testify that the investments were a sham. Rosenberg testified at the hearing on the pending motion that he refused to do that on two separate occasions. If Rosenberg had testified at the trial in 1984 that the investments were a sham, petitioners would have a stronger claim now, but he did not testify at that trial at all. Rosenberg's current testimony does not support petitioners' contentions. Petitioners allege a pattern in which respondent's counsel offered to settle with Goulding's clients in various tax shelter cases only if those clients would fire Goulding. They *232 contend that Sabin and Gore directed Feinglass to make such an offer to Rosenberg. Feinglass has made inconsistent statements in that regard. To support their allegations, petitioners offered evidence that a similar tactic was employed by Gore in relation to an unrelated group of cases involving Goulding. Respondent contends, and the Court agrees, that evidence of the other and later context is not admissible under Rule 404 of the Federal Rules of Evidence. Assuming, however, that respondent's counsel attempted to deal with Goulding's clients in violation of Rule 4.2, Model Rules of Professional Conduct, such conduct was not directed at petitioner's right to a fair trial. Even if the proffered evidence were considered, therefore, it would not persuade us that such conduct constituted a fraud on the Court in this case. Petitioners contend that "The circumstances surrounding the criminal fraud referral of Mr. Drobny were inexcusable." They imply a violation of the Internal Revenue Manual. Again, they have not shown any false statements or concealment relating to the fraud referral. At most, respondent's agents were taking inconsistent actions, none of which was patently unreasonable *233 in view of the circumstances of the case. We cannot infer a fraudulent plan or conspiracy from these facts. Many of the matters that petitioners complain of occurred in open court. They complain, for example, that pendency of the criminal investigation of petitioner was announced in open court in front of Samotny, prior to Samotny's testimony. Petitioners have not indicated how, if at all, Samotny's testimony was affected by truthful statements made in open court in his presence. They contend that Kamensky should have been given the "same assurances" that had been given to Samotny. Neither the failure to give assurances to Kamensky nor his assertion of his privilege against self-incrimination is extraordinary or unreasonable in these circumstances. Petitioner asserts as a fact that, in April 1984, Nagler served a subpoena on Kamensky and that petitioners' primary defense to the civil fraud claim was reliance upon Kamensky. They claim now that Kamensky was a crucial witness. Yet they did not list Kamensky in their trial memorandum because they intended to call Kamensky only in rebuttal to respondent's evidence on the civil fraud penalty. During the hearing in June 1984, Kamensky's *234 counsel complained that respondent had wrongfully caused Kamensky to come to Court and assert his Fifth Amendment privilege. Kamensky gave his view of his conversation with Sabin, and Sabin gave his view. Neither the communications nor the basis for the assertion of the privilege were concealed from nor misrepresented to petitioners or to the Court. In Kenner v. Commissioner, 387 F.2d at 691 (7th Cir. 1968), the Court of Appeals for the Seventh Circuit stated: there is a heavy burden both of particularized pleading and of proof upon the one who seeks to impeach an order or decree of a court. "There must be an offer to prove specific facts which will pretty plainly impugn the official record". [United States ex rel. Accardi v. Shaughnessy, 206 F.2d 897, 904 (2d Cir. 1953).] It "is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision". [England v. Doyle, 281 F.2d 304, 309 (9th Cir. 1953).] "'Fraud upon the court' should, we believe, embrace only that species of fraud which does, or attempts to, defile the court itself, *235 or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication". [7 Moore's Federal Practice, 2d ed. p. 512, par. 60.23.] [Fn. refs. omitted.]
Discussing the specific allegations in that case, the court commented that "Even assuming, however, that the agents were hostile or had an attitude of unfairness toward Dr. Kenner, the petition [of Dr. Kenner] leaves us completely in the dark as to how the agent fraudulently induced the court to decide against Dr. Kenner." Kenner v. Commissioner, 387 F.2d at 692. Similarly in this case, petitioners have not persuaded us that any of the matters they complain of were intended to or did affect the decision of the Court in this case. In his Opinion in this case, Judge Simpson considered and rejected petitioners' claim of reliance on others, specifically Kamensky. Petitioners' supposition that "Perhaps Kamensky would have persuaded Judge Simpson that Petitioners' deduction was legitimate or that a fraud penalty was not warranted, or both" ignores the analysis in the Court's Opinion. *236 Kamensky no doubt would have attempted to justify his involvement in the tax shelter promotions, but this testimony would have been cumulative and subject to the same reasons for rejecting it that Judge Simpson gave for rejecting petitioner's testimony. Adding the subjective opinions of other interested persons in the litigation would have not changed the objective facts on which the Opinion is based. To the extent that petitioners believe that they were unfairly denied "a cash out-of-pocket" settlement because of a vendetta by Feinglass against Goulding, they would be seeking something that this Court has consistently denied taxpayers. See Chao v. Commissioner, 92 T.C. 1141, 1144 (1989), and cases cited therein. Petitioners have cited no case in which comparable facts have resulted in a different decision. Thus the decision here was not obtained by the conduct complained of, whether or not it was wrongful. Petitioners argue that "In order to have a decision overturned, it is not necessary that the court find that the prior decision was obtained as a direct result of fraud on the court nor that the court would have reached a different result had *237 the fraud not occurred." Petitioners' argument cannot be reconciled with the language of Kenner or similar cases. The seminal case of Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944), involved specific fabrication by an attorney for one of the parties, which was relied on in the decision of the court. See Wilkin v. Sunbeam Corp., 466 F.2d 714, 717 (10th Cir. 1972). Other courts have referred to "an unconscionable plan or scheme which is designed to improperly influence the court in its decision." England v. Doyle, 281 F.2d 304, 309 (9th Cir. 1960) (quoting Kenner v. Commissioner, supra at 691). This language implies direct causation. See also Chao v. Commissioner, supra.To justify setting aside a decision for fraud, a party must show more than conduct of counsel during settlement negotiations or during trial that is within bounds of aggressive advocacy on behalf of a client. See Kerwit Med. Products, Inc. v. N. & H. Instruments, Inc., 616 F.2d 833, 837 (5th Cir. 1980); Wilkin v. Sunbeam Corp., supra; *238 Kupferman v. Consol. Research & Manufacturing Corp., 459 F.2d 1072 (2d Cir. 1972). If ethical rules have been violated, appropriate referrals to bar associations may be made by the injured party, other attorneys, or the Court. They are not sufficient cause to vacate a decision that has become final. In summary, we cannot conclude that respondent was guilty of misrepresentation or concealment or that the Court was in any way deceived as to the facts on which it based its decision. We are not persuaded that the conduct of respondent's attorneys or agents was designed to deny a fair trial to petitioner. Whether or not the actions taken were wise or appropriate, they were a response to the facts of the tax shelter promotions as perceived by respondent. Petitioners have not satisfied their burden of proving fraud on the Court. An appropriate order will be issued denying petitioners' motion for leave to file motion to vacate.