Sheldon **DROBNY** and Anita Drobny, Petitioners–Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 95–2966.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1996.

Decided May 1, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied June 5, 1997.

Sheldon Drobny, argued, Northbrook, IL, pro se.

Anita Drobny, Northbrook, IL, pro se.

Gary R. Allen, Kenneth L. Greene, Janet Bradley, argued, Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for Respondent–Appellee.

Before COFFEY, MANION and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

The petitioners-appellants, Sheldon and Anita Drobny, are husband and wife. During the late 1970's, Sheldon Drobny, a former IRS agent, was a partner in the accounting firm of Adler & Drobny, Ltd., based near Chicago, Illinois. Drobny promoted (and he and his wife invested in) two "research and development" programs purportedly designed to develop the substance known as "aloe vera" for commercial purposes. "Aloe vera" is an extract of the *Aloe Barbadensis* plant, and today is used in many skin-care and personal hygiene products. The Drobnys, on their joint federal income tax return for 1979 (prepared by Sheldon Drobny), claimed certain losses as deductions in connection with their investment in the aloe vera research and development programs. In 1983, the Illinois District Director of the IRS (based in Chicago, Illinois) disallowed these deductions, after determining through investigation that they were part of an impermissible "tax shelter" scheme, and informed the Drobnys that they were liable for a $10,877 tax deficiency. The District Director also notified Sheldon Drobny that he was liable for a civil fraud penalty (or "addition to tax") in the amount of $5,439. The Drobnys petitioned the Tax Court for a re-determination

of the deficiency and the addition to tax. Following a trial, the United States Tax Court ruled in favor of the Commissioner. *Drobny v. C.I.R.*, 86 T.C. 1326, 1986 WL 22150 (1986) (*"Drobny I"*). The Drobnys failed to file a timely notice of appeal [1] or a timely motion to vacate or revise the decision, which became final on September 24, 1986 (90 days after the decision was entered). Fed.R.App.P. 13(a); 26 U.S.C. § 7481(a)(1). In February of 1994, more than seven years after the decision became final, the Drobnys filed a motion to vacate the 1986 decision in *Drobny I*, arguing that the Tax Court should set aside its previous decision because the Commissioner, through his agents and attorneys,[2] had allegedly engaged in conduct that amounted to a "fraud upon the court." After a lengthy hearing, the Tax Court found that the petitioners had fallen short of demonstrating a "fraud upon the court" that would warrant vacating an otherwise final decision and denied the motion on May 17, 1995. *Drobny v. C.I.R.*, 69 T.C.M. (CCH) 2600, 1995 WL 298903 (*"Drobny II"*). We affirm.

## I. BACKGROUND

Petitioner Sheldon Drobny, a Certified Public Accountant, worked for the Internal Revenue Service ("IRS") from 1967 until 1971, when he entered the private practice of accounting in the Chicago, Illinois area. During the 1970's, Drobny began to promote tax shelters, often working closely with a Chicago attorney named Marvin Kamensky, who specialized in the formation of research and development tax shelters.

In November of 1979, Kamensky and one of his associates, Marc Z. Samotny, came to Drobny to enlist his support in the promotion of two enterprises (a partnership and a joint venture) that were ostensibly designed to develop products based on the substance aloe

---

1. The petitioners filed an untimely appeal with this court on September 25, 1986, one day after the 90–day period specified by Fed.R.App.P. 13(a), and subsequently filed a motion to dismiss the appeal, which the court granted October 29, 1986.

2. When the petitioners refer to the Commissioner's "agents and attorneys," they are referring, respectively, to the Office of the District Director for the Illinois District (e.g., Agents Rosen and Feinglass) and the Office of the District Counsel for the Illinois District (e.g., Assistant District Counsel Dow and Attorney Sabin).

vera.[3] These alleged business enterprises are referred to in the briefs and in case law as "tax shelters," for they were structured to take advantage of the tax laws by allowing the investor to deduct his proportional share of losses incurred by the program (e.g., money devoted to research and development) on his personal income tax return. The higher the income-tax bracket of the investor, the greater the value of the deduction.[4] Kamensky and Samotny, the tax attorneys, persuaded Drobny, the certified public accountant, to solicit his clients and associates who might be interested in participating in the aloe vera tax shelters as investors. Drobny agreed, and was listed in the offering materials as a promoter and referred to as a member of an accounting firm that specialized in financial and tax consultation. Drobny and his wife, petitioner-appellant Anita Drobny, *also became investors* in the two programs, along with 21 others. On their joint income tax return for 1979, the Drobnys deducted approximately $28,000 as their *pro rata* share of "research and development" losses incurred by the two *aloe vera* programs.[5]

In 1981 or 1982, the office of the District Director for the Illinois District of the IRS, based in Chicago, Illinois, commenced an investigation of the two aloe vera programs and Sheldon Drobny's involvement in them. Revenue Agent Noreen Rosen was in charge of this investigation, but she received assistance from Irving Feinglass, a former colleague of Drobny's at the IRS. Rosen concluded that the "research and development" losses incurred by the aloe vera enterprises would not be allowed as deductions on the investors' returns, and prepared a report (dated November 23, 1982) summarizing the basis for her recommendations. On December 16, 1982, Agents Rosen and Feinglass met with Sheldon Drobny in his office to discuss the report and the possibility of settling the dispute, but no agreement was reached.

On April 15, 1983, the District Director for the Illinois District of the IRS sent a notice to the Drobnys formally disallowing the deductions claimed on their 1979 return in connection with the aloe vera promotions, and stating that Sheldon Drobny was liable for a civil fraud penalty (or "addition to tax") in the amount of $5,439, pursuant to 26 U.S.C. § 6653(b). The Drobnys filed a petition with the Tax Court contesting the notice of deficiency as well as the civil penalty, pursuant to 26 U.S.C. § 6213(a).

The Drobnys' case came to trial during a particular time period when the IRS and the Tax Court were experiencing a tremendous increase in their respective caseloads, partly as a result of the popularity of "tax shelter" schemes similar to Drobny's. Sometime during 1983, Harmon Dow, then an Assistant Illinois IRS District Counsel, telephoned Tax Court Judge Charles R. Simpson, an acquaintance who was serving as Chairman of the Tax Court's Rules Committee, to discuss

---

3. These programs sought to take advantage of the growing interest in the alleged medicinal properties of aloe vera. The partnership, known as AloEase Partnership, was formed to develop and market an aloe-vera-based eye care product (similar to Visine or Murine). The joint venture, Farm Animal Product Venture, was formed to develop and market "PorkPardner," a "medicine to be fed to farm animals, particularly hogs, for the prevention and treatment of various diseases that decrease the size of litters and adversely affect the health of small pigs." *Drobny I*, 86 T.C. at 1328. The partnership and the joint venture were structured to maximize tax advantages for investors, as the court explained in detail in *Drobny I*.

4. The promotional materials for the programs indicated that for each unit or share purchased, the expected net tax benefit would vary significantly depending on whether the investor was in the 50% or 70% tax bracket.

5. Such deductions were not improper *per se*. As the Tax Court in *Drobny I* explained, a taxpayer could legitimately claim a deduction for "research or experimental expenditures which are paid or incurred by ... [the taxpayer] ... in connection with his trade or business." *Drobny I*, 86 T.C. at 1339–40 (citing 26 U.S.C. § 174(a)(1)). However, in order to constitute a "trade or business," the activity in question must have had the "actual and honest objective of making a profit." *Id.* at 1339–43 (and authorities cited therein). An enterprise primarily intended to produce tax savings, without any significant likelihood of an economic profit, would not meet the definition of "trade or business" set forth by the Tax Court in *Drobny I*, and therefore the losses of such an enterprise would not be deductible. *Id.*

the large number of pending cases and how the court might best facilitate the handling of them. Dow was of the opinion that special procedures would be required to deal with the large number of cases. At Judge Simpson's request, Dow forwarded a computerized print-out of some 2,500 pending cases (including the Drobnys') to the judge. Subsequently, the Chief Judge of the Tax Court assigned the Drobnys' case and 14 others involving the aloe vera tax shelters to Judge Simpson, who set a hearing date for January 16, 1984 so that the court could identify several "test cases" that could proceed to trial during a special session of the court.[6] At the January hearing, the Drobnys' case was selected as a "test case" and set for trial on April 30, 1984. Counsel for the Drobnys did not object to the assignment of the case to Judge Simpson for the Chicago special session, nor did they challenge the selection of the case as a "test case," nor did they protest the scheduled trial date.

When the Drobny case was called for trial, the Government was represented by William C. Sabin, Jr., who worked under the direction of Harmon Dow in the Office of the District Counsel for the Illinois District of the IRS. Sabin informed the Judge, in open court, that a criminal investigation of Drobny was pending.[7] Samotny, one of the potential defense witnesses in the civil case, was in the courtroom when this announcement was made.[8] The court granted the parties' joint oral motion for a continuance of the civil action until June 25, 1984. During the month of May, preceding the civil trial, the District Director for the IRS's Illinois District decided to discontinue the criminal investigation of Drobny, and confirmed this decision in a letter to Drobny's counsel.

The Drobnys' civil trial commenced in late June, after the District Counsel for the Illinois District had informed the Drobnys' attorney in writing of the IRS's decision not to proceed with the criminal investigation of Sheldon Drobny. Apart from Samotny, potential witnesses at the trial included Kamensky, the attorney who structured the aloe vera tax shelters, and Benjamin Rosenberg, an accountant and one of those whom Drobny had persuaded to invest in the tax shelters. Prior to trial, the Tax Court had ordered that the parties submit trial memoranda, which were to include, inter alia, a list of each side's prospective witnesses. The trial memorandum submitted by the Drobnys on the opening day of the trial identified five individuals whom the defense intended to call as witnesses, but the list included neither Kamensky nor Rosenberg as defense witnesses.

On the evening before Marvin Kamensky was scheduled to appear as a Government witness in the trial, Kamensky spoke by telephone with Sabin, the IRS's counsel. The following day, when the Government called Kamensky to the stand, he refused to answer questions concerning the aloe vera tax shelter programs, invoking his Fifth Amendment right not to testify. The Drobnys maintain that Sabin threatened Kamensky during the course of the phone conversation the night before his trial testimony; specifically, they claim that Sabin told Kamensky that if he "did not testify as the Government believed he should testify, the IRS could open a case against him and charge him with perjury." Sabin also stated (again according to the petitioners) that "he could give Mr. Kamensky no assurances that he was not the target

---

6. By identifying and trying several "test cases" in advance, the court hoped to obviate the need for a trial in each and every one of the fifteen similar cases. Known as the "Chicago Experiment," this procedure was designed to expedite matters by encouraging the settlement of cases.

7. On January 12, 1983, Agent Rosen had forwarded a "criminal fraud report" to the Criminal Investigation Division of the District Director's office, requesting that Drobny be criminally investigated for possible violations of 26 U.S.C. § 7201 (tax evasion) and 26 U.S.C. § 7206 (tax fraud/false statements).

However, as the Tax Court in Drobny II noted, "no criminal investigation field work was performed on the criminal fraud report referral.... Petitioner was also recommended as a target in a grand jury request that identified several Chicago area individuals involved in abusive shelters, but he was not approved as a target." 69 T.C.M. at 2601.

8. Samotny ultimately testified at the trial, but only after the District Counsel assured him in writing that he was not the target of an investigation.

of any investigations" by the IRS in connection with the aloe vera tax shelters.[9] These alleged threats, according to the Drobnys, were part of a "fraud upon the court" perpetrated by the IRS, and provide a basis for vacating the Tax Court's 1986 decision.

When Kamensky invoked his Fifth Amendment right not to testify, the Government asked leave of the court to direct the witness to answer the questions put to him. The court then inquired of Kamensky the basis for his assertion of the Fifth Amendment privilege. The court heard testimony from both Kamensky and Sabin concerning the phone conversation of the previous night. Kamensky asserted that Sabin had threatened him during the phone conversation, saying that if he did not give testimony favorable to the IRS's case, the Government would file perjury charges against him. Kamensky also stated that he feared the Government was "out to get him" (i.e., that it would make him the target of a criminal investigation). Sabin denied that he had, at any time during this phone conversation, referred to a perjury charge and further stated: "[Kamensky]—to the best of our knowledge—well, I would say *categorically*, that he is not under any criminal investigation at this time [n]or does one appear imminent."[10] The court excused Kamensky from giving testimony concerning the tax shelters, concluding that although there was no *pending* criminal investigation of Kamensky, "there may be some basis for [Kamensky] to fear that any testimony by him might lead to ... criminal action against him."

In November of 1994, more than ten years after the 1984 trial, the Tax Court (Chief Judge Mary Ann Cohen, presiding) conducted a hearing on the petitioners' motion to vacate the decision in *Drobny I* (the denial of that motion is, of course, the subject of this appeal). Testifying before Chief Judge Cohen at this 1994 hearing, Kamensky addressed the allegedly threatening phone conversation with Sabin that had occurred some

ten years previously, stating that he was "frightened" as a result of this conversation and immediately consulted an attorney, who advised him not to testify. From the vantage point of more than a decade, Kamensky recalled the substance of the conversation as follows:

> [Sabin] then said, and *this is many years ago,* but he said something to the effect that, We have information about this transaction, and if you don't—*this is the way I remember it was meant, not necessarily the way it was said*—If you don't say what we want, we are going to get you on perjury. Or we—no, we could—I still—I remember the word he used, We could get you ... that word I do remember, We *could* get you. (emphasis added).

In this appeal, the Drobnys claim that the Government's "fraud upon the court" encompassed, not just the alleged intimidation of Kamensky, but also intimidation of a potential witness named Benjamin Rosenberg. Prior to the 1984 trial, the Drobnys asked Rosenberg to testify on their behalf, but he declined to do so. The Drobnys did not subpoena Rosenberg's testimony, nor did they list Rosenberg as a prospective witness in their trial memorandum. Rosenberg, an accountant, was one of the individuals Drobny had persuaded to invest in the aloe vera tax shelters. The Drobnys now allege that Rosenberg was reluctant to testify because of pressure from the Government. Specifically, they claim that Agent Feinglass approached Rosenberg prior to the trial and offered to settle Rosenberg's case, if he would agree to (1) testify that the aloe vera tax shelters were a sham, and (2) discharge his attorney, Randall Goulding. The Drobnys' claims concerning Rosenberg are not based upon any direct testimony from Rosenberg, but upon Drobny's testimony (at the 1994 hearing) concerning private conversations between himself and Rosenberg that allegedly occurred in "approximately 1992 or 1993." At the 1994 hearing on the Drobnys' motion to

---

9. In mid-May 1984, prior to the trial, the District Counsel had provided written assurances to Kamensky's associate, Marc Samotny, stating that he was "not a target of any investigation." No similar assurances were provided to Kamensky.

10. Sabin further testified that he had recently spoken with one of his superiors at the IRS, who informed him that an investigation of Kamensky was neither pending nor imminent.

vacate, Rosenberg himself testified that "he did not recall telling petitioner [Sheldon Drobny] that he declined to testify because of implied threats by Feinglass." *Drobny II,* 69 T.C.M. at 2605.

On June 26, 1986, the Tax Court entered its decision in *Drobny I,* ruling in favor of the IRS. The opinion, authored by Judge Simpson, concluded that the Drobnys were not entitled to claim losses arising from the aloe vera programs' research and development expenditures as deductions on their jointly-filed 1979 return. The court disallowed these deductions because of compelling evidence that "the investment programs entered into by the petitioners were primarily intended to produce tax savings without any significant likelihood of an economic profit." *Drobny I,* 86 T.C. at 1343.[11] The tax tribunal also found that Sheldon Drobny was liable for a civil fraud penalty (or "addition to tax") under 26 U.S.C. § 6653(b), reasoning that he had "[known] that some or all of the research and experimental expenditures arising from the programs were not deductible and ... intentionally reported losses [as deductions] ... on his 1979 income tax return, resulting in a fraudulent underpayment of tax." *Drobny I,* 86 T.C. at 1350. The court in its opinion referred to the evidence of Sheldon Drobny's fraudulent conduct (i.e., his knowingly claiming impermissible deductions) as "considerable," noting that in light of Drobny's expertise, knowledge, and sophistication in the area of tax law, it was highly improbable that he had unknowingly claimed impermissible deductions. The petitioners failed to file a timely motion to vacate or revise the decision, much less a timely notice of appeal, and the Tax Court's decision in *Drobny I* became final on September 24, 1986.

In early 1994, the Drobnys filed a motion to vacate the 1986 decision, pursuant to Tax Court Rule 162, asserting that the decision "was the result of a fraud on the court perpetrated by the Commissioner's wrongful, deceitful, and illegal conduct ... [that] pre-

vent[ed] the Court: (1) from having the benefit of all the evidence and (2) from being able to render a fair and impartial decision." The Drobnys' motion was filed almost eight years after the decision in *Drobny I* became final. After the hearing,[12] the Tax Court concluded that the petitioners had fallen short of satisfying their burden of establishing a "fraud upon the court" and denied the motion to vacate *Drobny I,*[13] finding that the petitioners "ha[d] neither shown nor cited any specific examples of false statements, willful concealment, or other misrepresentations by respondent's counsel or other agents." *Drobny II,* 69 T.C.M. at 2605.

## II. ISSUE

The issue presented is limited to the question of whether the Tax Court in *Drobny II* abused its discretion in denying the petitioners' motion to vacate *Drobny I.* We wish to make clear that we are not called upon to review the question of whether the deductions claimed by the Drobnys were improper and/or fraudulent. That was the substantive question of tax law presented in *Drobny I,* which we see no necessity to revisit. Our sole task is to determine whether the Tax Court's 1986 decision was procured by a "fraud upon the court."

## III. DISCUSSION

### A. Standard of Review

■ A Tax Court ruling denying a motion to vacate is reviewed under the abuse of discretion standard. *Harbold v. C.I.R.,* 51 F.3d 618, 621 (6th Cir.1995) (and cases cited therein); *Abatti v. Commissioner,* 859 F.2d 115, 117 (9th Cir.1988); *Lentin v. C.I.R.,* 243 F.2d 907, 908 (7th Cir.1957) ("substantive motion to reconsider ... [is] within sound discretion of the Tax Court."). In an analogous context, i.e., when a district court has denied a motion to vacate under Federal Rule of Civil Procedure 60(b), we apply the same abuse of discretion standard. *See, e.g.,*

---

11. *See supra* note 5.

12. The hearing was three days long and included testimony from a dozen witnesses as well as approximately 200 exhibits.

13. The opinion in *Drobny II* was authored by the Hon. Mary Ann Cohen, Chief Judge of the U.S. Tax Court.

*Simons v. Gorsuch,* 715 F.2d 1248, 1253 (7th Cir.1983) (denial of motion to vacate judgment for fraud and misrepresentation was not an abuse of discretion).

## B. "Fraud Upon the Court" as Grounds for Vacating a Tax Court Decision

A decision of the Tax Court becomes final upon the expiration of the time allowed for the filing of a notice of appeal. 26 U.S.C. § 7481(a)(1); *see also Lentin,* 243 F.2d 907. Generally, a notice of appeal from a Tax Court decision must be filed within 90 days after the entry of the Tax Court's decision, but the timely filing of a motion to vacate or revise the decision extends the 90–day period. 26 U.S.C. § 7483; Fed.R.App.P. 13(a). Under Tax Court Rule 162, a motion to vacate or revise must be filed within thirty days after the Court's entry of the decision. Rule 162, 26 U.S.C. foll. § 7453. Thus, as previously noted, the decision in the Drobnys' case became final on September 24, 1986, as the petitioners filed neither a timely motion to vacate nor a timely notice of appeal.

▇ "The Tax Court is a court of limited jurisdiction," and, unlike an Article III federal court, "lacks general equitable powers." *C.I.R. v. McCoy,* 484 U.S. 3, 6, 108 S.Ct. 217, 219, 98 L.Ed.2d 2 (1987). The authority of a court of limited jurisdiction to vacate final judgments has been narrowly construed. Specifically, once a decision of the Tax Court has become final, it may be vacated "only in certain narrowly circumscribed situations." *Curtis v. C.I.R.,* 72 T.C.M. (CCH) 369, 371, 1996 WL 453870 (1996); *Kenner v. C.I.R.,* 387 F.2d 689, 690 (7th Cir.), *cert. denied,* 393 U.S. 841, 89 S.Ct. 121, 21 L.Ed.2d 112 (1968) (the finality of a tax court judgment "precludes any subsequent reconsideration by the tax court, at least on such grounds as mistake, newly discovered evidence, and the like."). Indeed, this circuit has continued to recognize only a single, narrow exception to the general rule of finality prescribed by Congress in 26 U.S.C. § 7481. In *Kenner,* this court held that the Tax Court could set aside an otherwise final decision only if the party seeking to vacate the decision could convincingly establish that the decision re-

sulted from a "fraud upon the court." 387 F.2d 689. In establishing this limited exception to the rule of finality, the court reasoned as follows:

> If any room has been left for a relaxation of the statutory finality in order to permit the tax court to consider whether its decision is the product of a fraud upon it, that is all that has been left.... We think, however, that it can be reasoned that *a decision produced by fraud on the court is not in essence a decision at all, and never becomes final.* It is most difficult to assume that Congress intended that a decision procured by fraud on the tax court could not be reached by any procedure in any tribunal, once the possibilities of direct review were exhausted. If a *convincing* case of *palpable* fraud on the court were presented, it is hard to justify a holding that it could not be considered. We conclude that the tax court has power to inquire into the integrity of its own decision even when such decision has become final and immutable in all other respects as a result of exhaustion of direct review or expiration of the time allowed for seeking review.

*Id.* at 691 (emphasis added). The *Kenner* court also emphasized that the burden of proof rests squarely with the party seeking to set aside the prior decision, and stated that this burden could not be met simply by making "a broad assertion that the tax court decision [was] tainted with fraud." *Id.* Rather, "there is a *heavy burden* ... upon the one who seeks to impeach an order or decree of a court," who must come forward with "*specific* facts which will pretty plainly impugn the official record." *Id.*

Defining the term "fraud upon the court," this court in its *Kenner* decision stated that the alleged improper conduct must rise to the level of an "*unconscionable plan or scheme ... designed to improperly influence the court in its decision*" before it may be deemed a "fraud upon the court." *Id.* (quotations, omitted) (emphasis added). The court stressed that not all deceptive or improper conduct rises to the level of a "fraud upon the court." Rather, " '[f]raud upon the court' ... embrace[s] only that species of

fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court *so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases* that are presented for adjudication." *Id.* (quoting 7 *Moore's Federal Practice*, 2d ed., p. 512, § 60.23). Thus, the "import [of *Kenner*] ... is to suggest that [the Tax Court] can re-examine an otherwise final decision when such decision was produced by [a] 'fraud upon the court' of the *most egregious nature*, and when such fraud *goes to the very heart of the adjudicative process*." *Deutsch v. C.I.R.*, 34 T.C.M. (CCH) 387, 388, 1975 WL 2715 (1975) (emphasis added). The narrow and limited definition of "fraud upon the court" set forth in *Kenner* "reflects the policy of putting an end to litigation," *id.*, and serves the "important legal and social interest" in preserving the finality of judgments. *Toscano v. C.I.R.*, 441 F.2d 930, 934 (9th Cir.1971). Like this court in *Kenner*, all of the circuits that permit the vacating of an earlier Tax Court decision on the basis of fraud have articulated a very narrow definition of "fraud upon the court" and have underscored the heavy burden faced by a party who seeks to set aside a prior Tax Court decision. *See Harbold*, 51 F.3d at 622; *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir.1989); *Abatti*, 859 F.2d at 118; *Senate Realty Corp. v. C.I.R.*, 511 F.2d 929, 931 (2d Cir.1975); *Stickler v. C.I.R.*, 464 F.2d 368, 370 (3d Cir.1972); *see also* Annotation, *Power of Tax Court to Grant Leave to File Motion to Vacate Its Final Decision on Ground of Fraud Upon the Court*, 24 A.L.R. Fed. 697 (1975) (1995 Supp.).

■■■ One particular aspect of the definition of "fraud upon the court" must also be clarified. The petitioners argue that "fraud upon the court," as interpreted in this circuit, does *not* require a showing that the alleged "fraud upon the court" was material, i.e., that

it affected the outcome of the case which the petitioners seek to vacate. According to the Drobnys, "it makes no difference whether or to what extent the prior decision was affected by the fraud." We are of the opinion that the petitioners were required to demonstrate, not only that the respondent engaged in conduct that was *intended* to mislead the court, but—of paramount importance—that the actual conduct affected the outcome of their case. We reject the petitioners' interpretation of what constitutes "fraud upon the court" and affirm the Tax Court's denial of the Drobnys' motion to vacate *Drobny I*.[14] Again we rely upon *Kenner*, which held that the appellant could not prevail on his motion to vacate because he had left this court "in the dark as to how the [IRS] agents fraudulently *induced* the court to decide against Dr. Kenner." 387 F.2d at 692 (emphasis added). The dictionary defines "induce" as "to lead or move by influence or persuasion," "to bring about the occurrence of; cause." American Heritage Dictionary 657 (2d College Edition 1982). Thus, it is clear from the language employed by this court in *Kenner* that in addition to establishing improper conduct, a taxpayer who attempts to set aside a prior judgment of the Tax Court must *also* explain how the alleged conduct induced, caused, or had a material effect upon the decision. Our holding (or rather, our clarification of *Kenner*) also finds support in various decisions of the United States Tax Court. For example, in *Murdock v. C.I.R.*, 72 T.C.M. 1324, 1996 WL 677505 (1996), the Tax Court stated that in order to prove "fraud upon the court," a petitioner seeking to vacate a decision must establish that "an intentional plan of deception designed to improperly influence the Court in its decision *has had such an effect on the court*." *See also Chao v. C.I.R.*, 92 T.C. 1141, 1144, 1989 WL 53824 (1989) (motion to vacate denied because same result would have been reached even in the absence

---

**14.** We disagree with the Drobnys' argument that a "fraud upon the court" can occur even if the allegedly improper conduct does not affect the outcome of the court's deliberations. Under the common law of fraud, a misrepresentation *in and of itself* (i.e., one that is not relied upon to the detriment of the defrauded party) is not actionable. In Illinois, for example, "the elements of common law fraud are: (1) a false statement

of material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce action by another in reliance on the statement; *(4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other resulting from that reliance*." *Athey Products Corp. v. Harris Bank Roselle*, 89 F.3d 430, 434 (7th Cir.1996) (emphasis added).

of the alleged fraud upon the court); *Abatti,* 86 T.C. 1319, 1325, 1986 WL 22149 (1986) (petitioner must show that deception "designed to improperly influence the court in its decision *has had such an effect* on the court.").[15] We see no reason to alter our previous, narrow definition of "fraud upon the court," which reinforces the salutary general rule that final judgments are, in fact, final. We do not agree with the petitioners' argument that a final judgment of the Tax Court should be subject to attack (possibly, as in this case, many years later) when the allegedly improper conduct had no effect on the outcome of the decision. The rule of finality lends stability to our legal system, and it is especially important in this litigious era when adversely affected parties seize upon almost any opportunity to prolong litigation. Accordingly, we re-emphasize that under our case law the "fraud upon the court" exception to the rule of finality is a *narrow* one, and the party seeking to vacate a prior decision must establish that the allegedly "fraudulent" conduct had its intended effect of misleading the court.

### C. Did the Agents or Attorneys of the Commissioner Commit a "Fraud Upon the Court" in Drobny I?

The next question we must address is whether the Drobnys have met their "heavy burden" of establishing a "fraud upon the court" in connection with *Drobny I,* and whether the Tax Court abused its discretion in denying the petitioners' motion to vacate. The Drobnys assert that the Commissioner's "attorneys and agents engaged in a scheme to prevent [them] from fully and fairly presenting their defense in the 1984 trial" and that, taken as a whole, this conduct "constituted fraud on the court." In arguing that a "fraud upon the court" took place, the Drobnys have adopted a "buckshot approach ... hop[ing] that a pellet will strike." *United States v. Boyles,* 57 F.3d 535, 548 (7th Cir.

1995). They allege the following improprieties: (1) Assistant District Counsel Dow's *ex parte* communication with Judge Simpson concerning the scheduling of pending cases (including the Drobny case) for trial, (2) the referral of Drobny to the Criminal Investigation Division as well as IRS Attorney Sabin's mention of this referral in open court in the presence of a potential witness (Samotny), and (3) intimidation of witnesses (including Kamensky and Rosenberg) by the Commissioner's agents and attorneys. After carefully considering these allegations (individually and in combination), the Tax Court concluded that the petitioners had failed to demonstrate that the Commissioner's attorneys or agents were "guilty of misrepresentation or concealment or that the Court was in any way deceived as to the facts on which it based its decision." *Drobny II,* 69 T.C.M. (CCH) at 2607. Our review of the record persuades us that the Tax Court was correct when it found that the petitioners had failed to meet their "heavy burden" of demonstrating a "fraud upon the court," i.e., "an unconscionable plan or scheme" which was "designed to [and did] improperly influence the court in its decision." *Kenner,* 387 F.2d at 691. Accordingly, we hold that the Tax Court did not abuse its discretion by denying the petitioners' motion to vacate.

### 1. Ex Parte Communication Between Dow (IRS) and Judge Simpson

The petitioners contend that one aspect of the alleged "fraud upon the court" took place even before their trial began, when Assistant District Counsel Harmon Dow contacted Judge Simpson (sometime in 1983) regarding the scheduling of a large number of pending tax shelter cases. As noted above, Judge Simpson was the then Chairman of the Tax Court's Rules Committee, and known to Dow as such. Before telephoning Judge Simpson, Dow obtained clearance from his superior,

15. The Supreme Court's decision in *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), discussed in the parties' briefs, did not involve the powers of the Tax Court to vacate prior decisions, but rather the equitable powers of a federal circuit court to set aside judgments procured by fraud. Unfortunately, while the *Hazel* court did discuss the issue of "fraud upon the court," its holding is somewhat unclear with regard to the question of whether such a fraud must be *material* in order to justify setting aside a previous decision. Because this court's opinion in *Kenner* is on point, it resolves the question before us and we choose to forego a discussion of *Hazel* at this time.

the District Counsel for the IRS. The petitioners now maintain that Dow initiated this *ex parte* contact in order to "manipulat[e] the judicial selection process [and] . . . secure for the trial, the judge of [the IRS's] selection." [16]

Initially, it should be pointed out that following the conversation with Dow, Judge Simpson did not assign the tax shelter cases to himself. Rather, it was the Chief Judge of the Tax Court who assigned these cases to Judge Simpson, without objection from the Drobnys,[17] for a special session in Chicago, Illinois. Thus, it is at best tenuous for the Drobnys to argue that the conversation between Dow and Simpson affected the selection of a particular trial judge for the Drobnys' case.

■ The contact between Dow and Judge Simpson was indeed *ex parte*, in the sense that it occurred without either the knowledge or consent of the Drobnys or the other petitioners whose tax shelter cases were then pending. However, as this court has observed on previous occasions, "[n]ot every *ex parte* communication is a procedural defect so substantial and so likely to cause prejudice that it entitles the claimant to an entirely new . . . proceeding." *Shidaker v. Carlin,* 782 F.2d 746, 752 (7th Cir.1986); *see also United States v. Napue,* 834 F.2d 1311, 1316 (7th Cir.1987) (*ex parte* proceedings in the criminal context are "disfavored," but do not automatically constitute reversible error); American Bar Association, *Annotated Model Rules of Professional Conduct* 338–39 (3d ed. 1996) ("Although *ex parte* communications

may give rise to discipline, they do not necessarily constitute grounds for reversal.").

■ Furthermore, because neither the specifics nor the merits of the individual tax shelter cases were discussed during the conversation, we are of the opinion that the discussion between Dow and Judge Simpson concerning court scheduling was not improper. In our considerate view, this discussion fell far short of rising to the level of an ethical violation, much less a deliberate "fraud upon the court." As a general rule, we frown upon any communication between a judge and any party to litigation pending before that judge, *when* the communication occurs outside the presence of the other party (or parties) to the suit and concerns a substantive matter. However, as a matter of professional ethics, it is well-established that an *ex parte* communication which does not concern the *merits* of the case is permissible. Charles W. Wolfram, *Modern Legal Ethics* 605 (West 1986); DR 7–110(B). The Drobnys allege, without support in the record, that Dow and Judge Simpson not only discussed the merits of the pending tax shelter cases, but that Dow "stigmatized" the cases by referring to them as cases involving "abusive shelters." However, when Dow testified at the Tax Court hearing in 1994 (conducted pursuant to the Drobnys' motion to vacate), it is of interest to note that he specifically and categorically *denied* that he ever characterized the tax shelter cases as "abusive," and maintained under oath that he and the judge "didn't talk about the substance of the [individual] cases," except to refer to them as tax shelter cases with similarities that might

16. The petitioners neither objected to the assignment of their case to Judge Simpson nor did they request that he recuse himself. The Drobnys' motion to vacate, filed with the Tax Court in 1994, did not allege that any improper *ex parte* communication had occurred between Dow and Judge Simpson, but this allegation was raised during questioning of Dow by Drobny's counsel at the 1994 evidentiary hearing on the motion to vacate. As explained *supra*, Dow acknowledged telephoning Judge Simpson but vigorously denied any impropriety. In their brief to this court, the petitioners insist, contrary to Dow's sworn testimony, that Dow characterized the tax shelter cases as "abusive tax shelter cases" in the course of his communication with Judge

Simpson. This allegation would appear to be pure speculation, or if the petitioners do have a concrete basis for this claim, they have failed to make it a part of the record.

17. The record before us does not reflect the precise date of either Dow's conversation with Judge Simpson (sometime in 1983) or the exact date when the Chief Judge of the Tax Court assigned the tax shelter cases to Judge Simpson. It is clear from the documents on file that the assignment of the cases took place sometime in the latter half of 1983, after the petitioners had requested of the Tax Court that their case be tried in Chicago, Illinois.

warrant consolidated or special proceedings of some kind.[18] According to Dow, the discussion was limited to generalities, including the "tremendous influx" of tax shelter cases as well as Dow's view that the Tax Court "ought to look into a different method of dealing with these cases" which "could not be handled by the ordinary processes of the Tax Court." The record is barren of any evidence, much less testimony, to contradict Dow's version of this conversation. Thus, on the basis of this record, we do not agree with the Drobnys' contention that Dow initiated contact with Judge Simpson in order to influence the selection of a trial judge, and we refuse to hold—on the basis of nothing more than the petitioners' bald and unsupported accusations-that the conversation referred to was part of an overall "unconscionable plan or scheme ... to improperly influence the court in its decision." *Kenner*, 387 F.2d at 691. In short, the innocuous communication between Dow and Judge Simpson concerning an improved procedure for dealing with the Tax Court's overburdened docket cannot serve as a basis for setting aside the decision in *Drobny I.*

The facts demonstrate that Assistant District Counsel Dow, with the approval of the District Counsel, was responding to the demands of an unprecedented caseload and that he contacted Judge Simpson (then Chairman of the Tax Court Rules Committee) to discuss the purely *administrative* issue of how best to proceed with the large number of pending tax shelter cases.[19] Dow's goal in contacting Judge Simpson was clearly to expedite the administration of justice, which can only be described as a laudable objective, for we all are aware of the old tried yet true cliche that "Justice delayed is justice denied."

### 2. *Criminal Investigation Referral*

As part of their "buckshot approach" to establishing a "fraud upon the court," the petitioners also claim that it was improper for Agent Rosen to refer Sheldon Drobny to the Criminal Investigation Division (part of the Office of the District Director for the Illinois District), for possible violations of 26 U.S.C. § 7201 (tax evasion) and 26 U.S.C. § 7206 (tax fraud/false statements). Although the facts of Drobny's case may well have warranted at least an investigation (if not the filing of formal criminal charges), we see no reason to even discuss the propriety of the criminal referral for a number of reasons, not the least of which is that the referral occurred in early 1983, *before* the Tax Court had jurisdiction over the Drobny case; thus, the referral *in and of itself* could not have been part of a "fraud upon the court."

The Drobnys also assert that it was improper for the Government's counsel to mention the criminal referral in open court when the Drobny case was first called for trial, because Samotny, a potential witness, was present in court. We fail to see how this truthful disclosure to the court, concerning the pendency of a criminal investigation,[20] could be interpreted as being part and parcel of a deliberate scheme or conspiracy to commit a "fraud upon the court," as the Drobnys maintain. This matter was properly raised by the Government's lawyer in order that the trial judge might be fully informed as to the status of all related matters and make an informed judgment as to whether or not to delay the proceedings. More importantly, as the Tax Court observed, the Drobnys have failed to establish "how, if at all, Samotny's testimony was affected by [these] truthful statements...." *Drobny II,* 69 T.C.M. at

---

18. As noted above, the court eventually adopted the so-called "Chicago experiment," in which representative "test cases" were tried first in order to encourage settlement in other, similar cases.

19. As noted by the Tax Court in its decision, Congress at this time had recognized the difficulties posed by the Tax Court's sizable backlog of cases and taken steps to enact appropriate legislation. H. Conf. Rep. No. 861, 98th Cong., 2d Sess. 985–86, 1984–3 C.B. (Vol.2) 239–40.

20. A criminal investigation of Drobny was pending as of the time his civil case was first called for trial in late April. An internal IRS memorandum circulated in early May 1984 referred to this investigation as "open and inactive," and after the investigation was officially closed on May 21, 1984, another IRS memo noted that no "criminal investigation field work" had ever been performed by the Criminal Investigation Division with respect to Drobny's case.

2606. Indeed, the record reflects that shortly after the criminal investigation was mentioned in Samotny's presence, the District Counsel provided Samotny with a written assurance that he was not the target of any criminal investigation by the IRS (for his role in the aloe vera tax shelters). In light of these steps taken by the IRS to alleviate Samotny's fears of criminal prosecution, we reject the Drobnys' contention that the reference to the criminal investigation in Drobny's case intimidated Samotny and thus constituted a "fraud upon the court."

### 3. *Intimidation of Witnesses*

Perhaps the only claim of the Drobnys that merits more in-depth discussion is their assertion that the Commissioner's agents and attorneys engaged in the intimidation of witnesses as part of a deliberate effort to improperly influence the decision of the Tax Court in *Drobny I.* When it is proven that an officer of the court (or anyone, for that matter) has attempted to intimidate a witness, such conduct is not only a serious ethical impropriety but is also frequently prosecuted as a criminal violation.[21] However, our inquiry deals with the question of whether the attorneys and agents of the Commissioner, through their interaction with certain witnesses or potential witnesses, attempted to perpetrate a fraud upon the court, i.e., a deliberate fraud that prevented the court from "perform[ing] in the usual manner its impartial task of adjudging cases." *Kenner,* 387 F.2d at 691.

The petitioners claim that Marvin Kamensky (whom the Drobnys now portray as a "key" defense witness) invoked the Fifth Amendment at trial because of alleged threats made by Sabin (counsel for the Commissioner) on the eve of Kamensky's scheduled testimony. The petitioners allege that Sabin told Kamensky that if he did not give testimony favorable to the Commissioner, the IRS could open a case against him and charge him with perjury. According to the Drobnys, Sabin refused to provide any assurances that Kamensky was not the target of a criminal investigation (whether he was in a position to give such assurances, without clearance from his superiors at the IRS, is not included in this record).

As an initial matter, we note that Kamensky was not even listed as a defense witness (much less a "key witness") in the petitioners' trial memorandum, so that we are skeptical, to say the least, of the Drobnys' argument before this court that Kamensky was "the witness most vital to their defense." Kamensky was the *Government's* witness (Sabin had issued a *subpoena duces tecum* on April 5, 1984 commanding Kamensky to appear before the Tax Court in the Drobny trial). Although the Drobnys assert that Sabin improperly threatened Kamensky with perjury charges, Sabin (appearing before Judge Simpson in 1984) emphatically denied ever *mentioning,* much less threatening, possible perjury charges. The evidence of a direct threat by Sabin rests largely on the testimony that Kamensky provided at the 1994 hearing on the motion to vacate, *ten years after the alleged threat took place.* At this hearing, Kamensky recalled that his telephone conversation with Sabin left him "more frightened than ... [he could] ever remember being ... in [his] life." With respect to the specifics of the conversation, however, Kamensky was far less certain. Kamensky qualified and limited his accusation by stating that Sabin mentioned the *possibility* of a perjury charge, and while Kamensky claimed to remember this long-ago conversation, he stated with some equivocation: "this is the way I remember it was meant, *not necessarily the way it was said.*" This tentative testimony from Kamensky, referring to statements allegedly made some ten years earlier, establishes that he personally may have perceived Sabin's comments on that particular date as threatening, but Kamensky's 1994 testimony falls far short of convincingly demonstrating that Sabin engaged in direct threats that would constitute witness intimidation and/or a fraud upon the court. Sabin's alleged comment that he was unable to provide any assurances to Kamensky that he was not the subject of an IRS

---

**21.** In Illinois, for example, witness and/or juror intimidation is a felony punishable by 2–5 years imprisonment. Ill.Ann.Stat. ch. 720, para. 5/32–4 (Smith–Hurd 1996); *see also Model Rules of Professional Conduct* Rules 3.4 and 4.2 (1994).

investigation in connection with the tax shelters was obviously made in reply to some kind of a request from Kamensky. We find nothing improper about Sabin's comment, if in fact it was made at all. Kamensky participated actively in the creation of the tax shelters and, although he may have keenly desired a statement from the IRS that he was not the target of an investigation, the Government was not required to give him such a guarantee (nor is it clear whether Sabin was even in a position to provide such an assurance without first consulting with his superiors).[22]

Furthermore, we note that on the day Kamensky was scheduled to testify, Judge Simpson was promptly and fully informed concerning the telephone conversation of the night before (which the petitioners now claim was improper, threatening, and part of a "fraud upon the court"). As noted by the court in *Drobny II*:

> During the hearing in 1984, Kamensky's counsel complained that respondent had wrongfully caused Kamensky to come to Court and assert his 5th amendment privilege. *Kamensky gave his view of his conversation with Sabin, and Sabin gave his view. Neither the communications nor the basis for the assertion of the privilege were concealed from or misrepresented to petitioners or to the Court.*

69 T.C.M. at 2606 (emphasis added). Although Judge Simpson excused Kamensky from further testimony on the basis of his invocation of his Fifth Amendment privilege, the judge did not so much as even hint that Sabin had engaged in any improper conduct, much less make a finding that Sabin's actions amounted to a fraud upon the court, i.e., that they had prevented the court from "perform[ing]" in the usual manner its impartial task of adjudging cases." *Kenner*, 387 F.2d at 691.

■ Was Sabin's conduct vis a vis Kamensky ethically proper? We state with certainty that there is nothing improper about a Government attorney speaking with a Government witness prior to trial. Discussion

between an attorney and his witness is a proper pre-trial procedure. If Sabin merely cautioned Kamensky that the Government wanted him to tell the truth and nothing but the truth, while reminding him of the seriousness of giving testimony under oath and committing perjury, that would also be proper and by no means unusual. Sabin *denies* having made any threatening comments, as alleged by the Drobnys. The trial judge did not make any factual findings on the question of whether Sabin engaged in such "threats," and it is well beyond our role as an appellate court to do so. *See, e.g., United States v. Wesson*, 33 F.3d 788, 792 (7th Cir. 1994) ("We will not reweigh the evidence or make credibility determinations; as an appellate court viewing the trial record, we are incapable of assuming the role of the factfinder."). In this regard, it is important to remember that while we appellate judges are confined to the "cold pages of a transcript" and thus cannot assess witness credibility, the judge or jury has "the opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements." *United States v. Lakich*, 23 F.3d 1203, 1210–11 (7th Cir.1994).

■ Fortunately, we need not resolve the factual question of what transpired in the conversation between Sabin and Kamensky in order to determine whether Sabin's conduct contributed to an alleged "fraud upon the court." That is because, even if we were to assume that Sabin *did* engage in improper threats of the kind alleged by the Drobnys, his conduct did not affect the outcome of the decision in *Drobny I* and for this reason it did not rise to the level of a "fraud upon the court" as defined in this circuit. The Drobnys argue that Kamensky's testimony, if proffered, would have helped their case. According to the petitioners, Kamensky-mysteriously unlisted in their trial memorandum and only now described as a "key witness"—would have corroborated Sheldon Drobny's

---

**22.** Nor do we accept the petitioners' argument that Kamensky should have received such assur-

ances merely because his colleague Samotny did.

testimony that he relied upon Kamensky for guidance regarding the aloe vera tax shelters, and thus did not know that the deductions were improper. If Kamensky (figuratively speaking, Drobny's "partner in crime") had given testimony favorable to Drobny, we think it unlikely that this testimony would have persuaded Judge Simpson of Drobny's innocence in light of (1) Drobny's sophistication and expertise in the area of tax shelters, (2) his substantial involvement in the promotion of the aloe vera programs, and (3) the fact that Drobny (not Kamensky) was the one who actually prepared the Drobnys' joint 1979 tax return. We are certainly doubtful that the testimony of an associate who was directly involved in the creation and promotion of the sham tax shelters would have made any difference to the judge's ruling in the case. In short, we agree with the Tax Court that "[a]dding the subjective opinions of other interested persons in the litigation [i.e., Kamensky] would have not changed the objective facts upon which the [1986] opinion [was] based." *Drobny II*, 69 T.C.M. at 2606.

■■■ The Drobnys also assert that prior to the trial, IRS Agent Feinglass "frightened [Benjamin] Rosenberg into not testifying" by telling him that the IRS would only agree to settle his case if he agreed (1) to testify that the aloe vera tax shelters were shams, and (2) to fire his attorney, Randall Goulding.[23] Although the Drobnys now describe Rosenberg as another of their "key witnesses" (like Kamensky) we find it strange that he was not even listed as a defense witness in the petitioners' trial memorandum and that the defense never even attempted to subpoena him to testify. Indeed, Steven Nagler, the petition-

ers' attorney in the 1984 trial, has stated that the defense "didn't consider [Rosenberg] crucial to the case." The allegation that Rosenberg was somehow intimidated by Feinglass does not rest on direct testimony in the record, but upon Sheldon Drobny's hearsay testimony at the 1994 hearing concerning conversations he had with Rosenberg in "approximately 1992 or 1993." Rosenberg's own testimony at the 1994 hearing was that "[h]e did not recall telling Drobny that he declined to testify because of implied threats by Feinglass." *Drobny II*, 69 T.C.M. at 2605. Furthermore, if we are to credit the 1994 testimony of petitioner Sheldon Drobny, it would appear that Rosenberg told Drobny he was most fearful of official proceedings of any and all kinds, for he was a survivor of the Holocaust. Thus, Agent Feinglass' alleged comments were not the only (and perhaps not even the most important) plausible explanation for Rosenberg's unwillingness to testify.

■■■ In order to establish that the Government's alleged intimidation of Rosenberg amounted to a fraud upon the court, the Drobnys must demonstrate *how* the "loss" of Rosenberg's testimony (which, we repeat, they never deemed crucial to begin with) affected the outcome of their case. However, the petitioners have once again failed to explain how the testimony of this additional, purportedly "key" witness would have helped their case. Based upon all of the facts and circumstances concerning the prospective witness Rosenberg, we are of the opinion that the Tax Court did not err when it found that Feinglass' alleged intimidation of Rosenberg fell short of being a "fraud upon the court."

---

**23.** At the 1994 hearing on their motion to vacate, the petitioners sought to introduce the testimony of Francis Emmons, an investor in a *different* tax shelter who was also represented by Goulding. In an offer of proof, it was established that Emmons would testify that one of Feinglass' colleagues, Loren Gore, made a settlement offer similar to the one allegedly made to Rosenberg, also conditioned on willingness to fire Goulding. This offer was allegedly made about *nine months after the Drobnys' trial concluded.* Exercising its discretion to admit or exclude testimony, the court ruled that Emmons' proffered testimony was irrelevant and inadmissible because it "was not directed at *petitioner's* right to a fair trial,"

and, even if admitted, "would not persuade [the court] that such conduct constituted a fraud on the Court *in this case.*" *Drobny II*, 69 T.C.M. at 2605 (emphasis added). It is well-established that "we reverse a [trial court's] decision to admit or exclude evidence only if there was a *clear* abuse of discretion." *Carroll v. Acme–Cleveland Corp.*, 955 F.2d 1107, 1114 (7th Cir. 1992). The Tax Court did not commit an abuse of discretion (much less a clear abuse of discretion) when excluding Emmons' testimony, for this testimony would have shed no light on the question before the court, which was why Rosenberg refused to testify in the Drobny trial.

To summarize, we agree with the Tax Court's conclusions as to each of the alleged improprieties discussed above and hold that none of them, taken alone or considered in combination, amounted to a "fraud upon the court" (as that term has been defined by this court and others). Thus, the Tax Court did not abuse its discretion when it denied the Drobnys' motion to vacate *Drobny I*. We are mindful of the extreme difficulty of reconstructing events that occurred during a trial ten years ago, and for this reason we give deference to the *Drobny II* court's findings. We also note that the almost eight-year delay in filing a motion to vacate is solely attributable to the petitioners.[24] Much of the allegedly improper conduct by the Commissioner's agents and attorneys either occurred in open court (the reference to the criminal referral at the commencement of the trial in 1984) or was well known to the Drobnys at the time of the trial (the alleged intimidation of Kamensky). Yet the Drobnys, for reasons unexplained in this record, failed to file their motion to vacate until almost eight years after *Drobny I* became final, and they have offered no explanation for this extended delay. The Tax Court in *Drobny II* observed that "[b]ecause of the passage of time, each of the witnesses at the [1994] hearing [on the motion to vacate] ... indicated some lack of recollection of the sequence of events and specific conversations that petitioner alleged to have occurred." 69 T.C.M. at 2604.[25]

## IV. CONCLUSION

We agree with the Commissioner that "[i]t is time to put the decision in *Drobny I* to rest." Decisions of the Tax Court which become final may not thereafter be vacated, unless the petitioner is able to convincingly demonstrate that the decision was procured by a "fraud upon the court," i.e., an "*uncon-*

scionable plan or scheme ... designed to improperly influence the court in its decision." *Kenner*, 387 F.2d at 691. The Drobnys have not met their "heavy burden" of establishing that the 1986 decision of the Tax Court was procured by a "fraud upon the court." *Id.* Most importantly, like the petitioner in *Kenner*, the Drobnys have "left us in the dark" concerning the critical issue of *how* the allegedly fraudulent conduct of the respondent "*induced*" or led the court to decide against them. *Id.* at 692. Because the Drobnys have failed to prove that any of the respondent's allegedly improper acts had any influence upon the outcome of their trial, we hold that the Tax Court did not abuse its discretion by refusing to set aside its earlier decision.

AFFIRMED.

---

24. The improper deductions were made on the Drobnys' 1979 return. In 1983, following investigation by the IRS and attempts to settle the matter, the IRS sent a notice to the Drobnys formally disallowing the deductions and assessing an "addition to tax" for civil tax fraud. The Drobnys contested the notice of deficiency and the addition to tax, and their case came to trial in Spring 1984. The Tax Court's decision in *Drobny I* became final in 1986. However, the Drobnys did not file their motion to vacate *Drobny I* until February 1994.

25. In some instances, the delay and consequent loss of recollection by witnesses actually hampers the effectiveness of the Drobnys' arguments. For example, as discussed above, Kamensky's 1994 testimony concerning the alleged threats by Sabin is very tentative and uncertain, and provides, at best, only weak support for the accusation that the Government engaged in improper conduct.