T.C. Memo. 1999-72


UNITED STATES TAX COURT


RICHARD L. AND MARJORIE A. PITTS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3937-97.                    Filed March 10, 1999.


Chester A. Swart, for petitioners.

Bradley T. Stanek, for respondent.


MEMORANDUM OPINION


NAMEROFF, Special Trial Judge:  This case was heard pursuant
to the provisions of section 7443A(b)(3)[1] and Rules 180, 181, and
182.  Respondent determined a deficiency in petitioners' 1993
Federal income tax in the amount of $3,141 and an accuracy-
related penalty under section 6662(a) in the amount of $628.

The issues for decision are:  (1) Whether petitioners
engaged in their horse-related activity during 1993 with the

_____

[1]  All section references are to the Internal Revenue Code
in effect for the year at issue.  All Rule references are to the
Tax Court Rules of Practice and Procedure.

objective of making a profit within the meaning of section 183; if so, (2) whether petitioners are entitled to a depreciation deduction for their barn; (3) whether petitioners realized a capital gain in the amount of $2,000 in 1993; and (4) whether petitioners are liable for the accuracy-related penalty pursuant to section 6662(a).[2]

## Background

As a preliminary matter, both parties raised relevancy objections to certain exhibits. Rule 401 of the Federal Rules of Evidence, applicable to this Court pursuant to Rule 143 and section 7453, defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Upon reviewing the exhibits in question, we find they are relevant within the meaning of rule 401 of the Federal Rules of Evidence. The objections are overruled.

Some of the facts have been stipulated, and they are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time they filed their petition, petitioners resided in Whittier, California.

Marjorie Pitts (petitioner) acquired her first horse and started training horses in 1958. She started showing horses professionally in 1960 for an executive on the east coast. Two

---

[2] Petitioners raised the issue of innocent spouse (as to one or both) in their petition but conceded the matter at trial.

of those horses that petitioner showed won New England Champion. In the early 1960's, both petitioners worked for the California Breeders Association in Circleville, Utah. Petitioners were in charge of breeding 12 stallions to over 100 mares on this farm. After leaving the California Breeders Association, petitioners moved to California and worked for Mr. John Dick, where they managed and trained horses on his farm. Then in the mid-1960's, petitioners took jobs not associated with the horse business.

In 1982 petitioners bought their house in Whittier on a half-acre parcel zoned "R-1", which does not permit horses. However, many of petitioners' neighbors also kept horses. In 1984, petitioners erected a portable barn on their property. The barn had a breezeway and four stalls. In back of the barn were four pipe pens. Petitioners acquired quarter horses around this time with the intent to breed and race them. In 1985 petitioners filed a Fictitious Business Name Statement stating that they were doing business as Midget Acres. Petitioners also received a public health license issued by the County of Los Angeles. Los Angeles County Code section 7.04.010 requires a license before the commencement of any business activity. Petitioners did not have a business license.

In 1986 and 1987 petitioners worked at the Kerr stock farm (the Kerr farm) where petitioner trained horses.[3] Petitioners took their own horses with them to the Kerr farm, where they

_____

[3] Petitioner testified that Mr. Pitts worked on underwater treadmills for the horses at the Kerr farm.

raised, bred, and raced them. The costs for the caring of petitioners' horses at the Kerr farm were included as part of petitioners' wages. Petitioners hired professional trainers for the racing of the horses. Their horses were racing at Los Alamitos, Golden Gate, and Bay Meadows racetracks.

Petitioners left the Kerr farm in 1987 and moved back to their house in Whittier with their horses. Petitioner was employed at Lawyers Mutual Insurance Co., and Mr. Pitts, suffering from a muscle-wasting disease which required drug therapy, stayed home.

Around 1988, petitioners decided that racing quarter horses was too expensive. The trainer's fees were high, and the purses were small. Petitioner owned a thoroughbred with five other people which had won $25,000 in a race in 1987. Petitioners decided to switch to thoroughbred horses because stakes races (such as the Kentucky Derby) paid higher purses. Petitioners sold some of their quarter horses and started acquiring thoroughbreds.[4]

Initially, petitioners acquired two thoroughbred mares and Ding Dong Daddy, a thoroughbred stallion that came from good blood lines. Petitioners offered Ding Dong Daddy for stud. According to a promotional flyer that petitioners distributed, Ding Dong Daddy had earned $24,964 in his first 2 years of racing. The flyer also detailed the horse's sire and female

---

[4] Petitioners did retain one quarter horse that they raced, and another that they bred.

lines and the racing history of those horses. Petitioners did not race Ding Dong Daddy. Petitioners bred him with their own horses and with outside horses for a stud fee. Petitioner bred Ding Dong Daddy with one of her mares and produced Blue's Ding Dong, which she sold. Blue's Ding Dong became a successful racing horse.

Petitioners also acquired another stallion named Halyard that allegedly sired $4 million worth of winners. Halyard, an older horse, was known to be a difficult breeder. Indeed, he produced no offspring for petitioners. Halyard died in 1996.

Petitioners listed both Ding Dong Daddy and Halyard in the Thoroughbred Times in 1993. The Thoroughbred Times is a stallion directory, and in petitioners' listings, they listed the bloodlines and the stud fees. The stud fee for Ding Dong Daddy was $1,000 and for Halyard, $1,250. But both fees were, as petitioner stated, "negotiable". Petitioners did not do any other advertising.

Midget Acres provided a "stallion service contract" to horse owners who wanted to breed a mare with one of petitioners' stallions. Petitioners would board a mare at their barn, and petitioner would check the mare to see when she was in heat and then determine when to do the breeding. Petitioners charged a booking fee which was 10 percent of the stud fee. If the mare gave birth to a live foal, petitioners would collect the stud fee. According to petitioner, it takes about a year from conception for the mare to give birth. Therefore, petitioners

would typically receive the booking fee in one year and the stud fee in the next.

During the year at issue, in addition to the quarter horses, petitioners owned seven horses:  Ding Dong Daddy and Halyard, three mares, and two yearlings.  Petitioners also boarded four additional horses during 1993.[5]  According to a chart submitted at trial, petitioners would charge $7 a day for boarding or $7.50 per day if the horse had a foal at her side.  These fees included feed.  The cost of feed per month per horse is about $100.  Petitioners would add veterinarian and trimming fees to the bill.  Of the four boarded horses, two were bred for which petitioners charged a $100 breeding fee.  Another horse had a foal at her side; it had been bred at Midget Acres in 1992, but the stud fee had not yet been collected.

Petitioners sold two of their horses, Jenny Sport and Actis Uptis, in October of 1993 for $1,000 each.  (It is not clear whether these horses were included in the seven referred to above.)  Jenny Sport was a racing horse that was a gift to petitioner after it broke down at the track, and Actis Uptis, sired by Ding Dong Daddy, was born at Midget Acres.  Petitioners did not have a cost basis for either horse.

Petitioners billed a total of $4,297 in 1993.  However, they collected only $2,892, including the $2,000 for the sales of the

---

[5]  With only four stalls and four pipe pens, petitioners had room for only eight horses.  When they had the additional boarders, petitioners sent their own horses to the neighbor's pen.

two horses.  According to petitioner, two of the horse owners never paid petitioners for boarding and fees; petitioners did not take legal action and were unsuccessful collecting the debt.

The parties stipulated that the following income, expenses, and losses from the horse-related activity were reported in petitioners' returns for the years 1986 through 1994 and 1996:[6]

| Year | Gross Income | Expenses | Net Loss |
|------|-------------|----------|----------|
| 1986 | $600 | $19,900 | ($19,300) |
| 1987 | 1,182 | 11,055 | (9,873) |
| 1988 | --- | --- | (9,032) |
| 1989 | --- | --- | (9,194) |
| 1990 | --- | --- | (12,655) |
| 1991 | 4,208 | 13,544 | (9,336) |
| 1992 | --- | --- | (15,970) |
| 1993 | 2,802 | 13,732 | (10,930) |
| 1994 | 2,000 | 7,146 | (5,146) |
| 1996 | 15 | 9,577 | (9,562) |

The record does not disclose the nature of the various gross income figures; i.e., whether from stud fees, boarding fees, sales of offspring, etc.  Copies of the various Schedules C were not exhibited, so we cannot even identify the major expense groups or whether any cost savings plans were put into effect.

For 1995, petitioners did not file a Schedule C, Profit or Loss From Business, with respect to the horse-related activity. According to petitioner, that year the stallions were sent away. Around 1996, a foal was born to petitioner's quarter horse mare, and petitioner is currently training this foal to be a show horse.  According to petitioner, the colt has received "reserved champion Pacific Coast quarter horse".

---

[6]  For the years 1988, 1989, 1990, and 1992, only the net losses were provided.

During 1993, petitioner worked about 35-37 hours a week as a litigation specialist, and Mr. Pitts, not working because of his disability, would feed and water the horses every day. After work, petitioner cleaned the stalls and did the heavy work that Mr. Pitts could not do. Petitioner consulted her breeding charts to see if any mares were due to breed, and she would do the breeding. Ding Dong Daddy was the stud used by petitioner in 1993.

For 1993, petitioner earned $52,815, and Mr. Pitts collected $11,659[7] in Social Security benefits. On their Schedule C for 1993 petitioners listed Midget Acres as their business. They reported $2,802[8] in gross income and claimed the following expenses:

| Expense | Amount |
| --- | --- |
| Car and truck | $2,182 |
| Depreciation | 1,818 |
| Office | 72 |
| Dues and subscriptions | 161 |
| Feed | 6,854 |
| Shoeing | 400 |
| Trash | 744 |
| Vet fees | 1,501 |
| Total | 13,732 |

This resulted in a net loss of $10,930. Petitioners retained receipts for the horse-related expenses.

---

[7] Of this amount, $5,830 was taxable.

[8] We note that petitioners' chart shows that they collected $2,892. This discrepancy was neither noticed nor explained but is irrelevant in light of our holding on the sec. 183 issue.

Petitioners' return was prepared by a certified public accountant whom they have used for a number of years. Petitioners were audited with regard to their horse-related activity for taxable year 1987 and were represented by their accountant for this audit. In the end, there was no deficiency for 1987 with respect to the horse-related activity.

### Discussion

In the notice of deficiency, respondent disallowed the claimed loss on the basis that petitioners did not establish that their horse activity was entered into for profit. Respondent also determined that petitioners failed to report a capital gain in the amount of $2,000 from the sales of two horses.

Substantiation is not an issue except for $753, the amount that petitioners claimed for depreciation of their barn. Petitioners no longer have documentation for their cost basis of the barn.

### Horse-Related Activity

We must decide whether petitioners' horse-related activity was engaged in for profit. Section 183(a) generally provides that if an activity engaged in by an individual is not entered into for profit, no deduction attributable to the activity shall be allowed, except as otherwise provided in section 183(b).[9] An

---

[9] Sec. 183(b) allows deductions for ordinary and necessary expenses arising from an activity not engaged in for profit only to the extent of gross income from the activity, less the amount of those deductions which are allowable regardless of whether the activity is engaged in for profit.

"activity not engaged in for profit" means any activity other than one for which deductions are allowable under section 162 or under paragraphs (1) and (2) of section 212. See sec. 183(c).

Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. To be engaged in a trade or business within the meaning of section 162, "the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

In order for taxpayers to deduct expenses of an activity pursuant to section 162, profit must be their primary or dominant purpose for engaging in the activity. See Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212; Polakof v. Commissioner, 820 F.2d 321 (9th Cir. 1987), affg. per curiam T.C. Memo. 1985-197; Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d 724, 726 (9th Cir. 1986), affg. Lahr v. Commissioner, T.C. Memo. 1984-472; Carter v. Commissioner, 645 F.2d 784, 786 (9th Cir. 1981), affg. T.C. Memo. 1978-202; Hirsch v. Commissioner, 315 F.2d 731, 736 (9th Cir. 1963), affg. T.C. Memo. 1961-256. Whether the taxpayer had the requisite profit objective is a question of fact to be resolved from all relevant facts and circumstances. See, e.g., Drobny v. Commissioner, 86 T.C. 1326, 1341 (1986), affd. 113 F.3d 670 (7th Cir. 1997); sec. 1.183-2(b), Income Tax Regs. Profit in this context means

economic profit independent of tax savings.  See, e.g., <u>Antonides v. Commissioner</u>, 91 T.C. 686, 694 (1988), affd. 893 F.2d 656 (4th Cir. 1990).

Section 1.183-2(b), Income Tax Regs., provides a non-exclusive list of factors we consider to determine whether the taxpayers are engaged in the venture with a profit objective. They include:  (1) The manner in which the taxpayers carried on the activity; (2) the expertise of the taxpayers or their advisers; (3) the time and effort expended by the taxpayers in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayers in carrying on other similar or dissimilar activities; (6) the taxpayers' history of income or loss with respect to the activity; (7) the amount of occasional profits that are earned; (8) the financial status of the taxpayers; and (9) whether elements of personal pleasure or recreation are involved.  No single factor is controlling, and we do not reach our decision by merely counting factors that support each party's position.  See <u>Dunn v. Commissioner</u>, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); sec. 1.183-2(b), Income Tax Regs.  Certain elements are given more weight than others because they are more meaningfully applied to the facts in our case.

### 1. Manner in Which Activity Is Conducted

The fact that a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity was engaged in for profit.

Sec. 1.183-2(b)(1), Income Tax Regs. Petitioners kept records of what was owed to them and how much to bill for veterinarian services and trimmings for the horses that they boarded. Petitioners maintained records for everything they spent on the activity and were able to substantiate just about every expense claimed. Nevertheless, petitioner testified that they referred to these records only when preparing their tax returns, not to monitor their expenses.

When petitioners determined that the breeding and racing of quarter horses would not be profitable, petitioners modified their operations by switching to thoroughbreds. However, other than owning a successful thoroughbred in a joint venture with several others, there is no evidence that petitioners investigated the merits of such a switch. Moreover, petitioners kept two quarter horses, the expenses for which were claimed on the Schedule C. Petitioner failed to explain why keeping those quarter horses reflected a profit objective. Furthermore, petitioner testified that Ding Dong Daddy and Halyard were valuable horses, but she did not reveal the price that was paid for them. Additionally, Halyard was an older horse and known to be a difficult breeder, and petitioner did not have any bookings for him. We fail to see a profit objective in acquiring Halyard, but more significantly, in keeping an unproductive stallion for nearly 8 years.

Petitioners did not prepare business or profit plans with cost projections or budgets. Petitioner stated that the

operation was too small for that. It does not appear that Midget Acres had a separate bank account. We find that petitioners did not conduct this activity in a businesslike manner.

## 2. Expertise of Petitioners

Preparation for an activity by extensive study or consultation with experts may indicate a profit motive where the taxpayer conducts the activity in accordance with such study or advice. See sec. 1.183-2(b)(2), Income Tax Regs. Petitioner has a long history with horses. Both petitioners have worked with horses, and petitioner especially has great knowledge and experience about bloodlines and with raising, training, showing, and breeding of various types of horses. Petitioners also spent quite a few years working for horse farms where they observed operations. Petitioner often helped out friends and business associates with the purchase of racing horses. Petitioner testified that she sought advice from Robert Hundley who was a trainer as Santa Anita Hollywood Park and a breeder of thoroughbred horses. However, petitioner did not testify as to the kind of advice sought nor the nature of the advice received.

While petitioners have excellent credentials for horse breeding, training, and racing, it is not clear whether they were experienced or sought advice with regard to the financial aspects of operating a horse business.

## 3. Time and Effort Spent in Conducting Activity

The fact that the taxpayer devotes much of his or her personal time and effort to carrying on an activity, particularly

if the activity does not have substantial recreational aspects, may indicate a profit motive. See sec. 1.183-2(b)(3), Income Tax Regs. Petitioner devoted about 20 to 25 hours per week to the horses, in addition to the amount of time Mr. Pitts spent feeding and watering the horses. It is not clear from the record how much time Mr. Pitts spent on the horse activity. Petitioner did all of the cleaning, breeding, and heavy work that Mr. Pitts could not do. Petitioner would consult the breeding charts and keep an eye on the mares to determine when they were in heat. This factor favors petitioners.

### 4. Expectation That Assets Will Appreciate in Value

An expectation that assets used in that activity will appreciate in value may indicate a profit objective. See sec. 1.183-2(b)(4), Income Tax Regs. Petitioner testified that she expected to get champions out of Ding Dong Daddy and Halyard since they came from good bloodlines. In fact, one of Ding Dong Daddy's offspring was a successful racing horse. However, there is nothing in the record that shows costs of petitioners' horses or fluctuations in their value.

### 5. Petitioners' Success in Similar or Dissimilar Activities

The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he or she is engaged in the present activity for profit, even though the activity is presently unprofitable. See sec. 1.183-2(b)(5), Income Tax Regs. There is no evidence that petitioners had been involved in other profit-

seeking activities before or during the operation of their horse-related activity. This factor is neutral.

### 6. Activity's History of Income and/or Loss

An activity's history of income or loss may reflect whether the taxpayer has a profit motive. See sec. 1.183-2(b)(6), Income Tax Regs. Unless explained by customary business risks or unforeseen or fortuitous circumstances beyond the taxpayer's control, a record of continuous losses beyond the period customarily required to attain profitability may indicate that the activity is not engaged in for profit. See id.

Petitioners have not had a profitable year since they started their horse-related activity. While petitioners may have expected the switch to thoroughbreds to be more profitable, according to the history of their activity, their losses increased. Petitioner testified that they switched because the stakes races had higher purses; however, in 1993 petitioners were not racing their horses, only breeding them. Furthermore, petitioners failed to produce credible evidence that the horse-related activity had a chance of recovering the losses they had already incurred. See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).

### 7. Amount of Occasional Profits

Occasional profits which are earned from an activity may indicate a profit motive. See sec. 1.183-2(b)(7), Income Tax Regs. The possibility of a substantial profit in a highly speculative venture may indicate a profit motive even where

profits are occasional and small or nonexistent.  See id.  Horse breeding and racing are highly speculative ventures.  Petitioners did not report a profit in any of the years they carried on the horse-related activity.

8. Petitioners' Financial Status

Substantial income from sources other than the activity, particularly if the losses from the activity generate substantial tax benefits, may indicate that the activity is not engaged in for profit, especially if there are personal or recreational elements involved.  See sec. 1.183-2(b)(8), Income Tax Regs.

Petitioner earned $52,815 in 1993, and Mr. Pitts received $11,659 in Social Security benefits.  Petitioners derived some tax benefits from their claimed losses.

9. Elements of Personal Pleasure

The mere fact that a taxpayer derives personal pleasure from a particular activity does not show a lack of profit motive.  See sec. 1.183-2(b)(9), Income Tax Regs.  The presence of personal motives may indicate that the activity is not engaged in for profit.  This is especially true when there are recreational elements involved.  See id.

It is not clear from the record whether petitioner rode the horses.  We assume that Mr. Pitts could not because of his disability.  It is clear, though, that petitioners enjoyed horses and have a long history of working with them.

10. Conclusion

While the matter is not free from doubt, on the basis of all the facts and circumstances, we hold that petitioners failed to prove that they engaged in their horse-related activity with the primary purpose and dominant intent of making a profit within the meaning of section 183. Accordingly, petitioners are not entitled to horse-related expense deductions in excess of their reported horse-related income.

As respondent has already prevailed on the primary issue, we need not address the substantiation issue with respect to the depreciation deduction for petitioners' barn.

Unreported Capital Gain

Respondent determined that petitioners failed to report $2,000 they received from the sale of Jenny Sport and Actis Uptis. We find that respondent is in error. According to the chart detailing the income activity of the business, petitioners reported the income from the sale of the horses along with the amounts they collected for boarding and booking fees on their Schedule C. Petitioners do not have unreported capital gain.

Accuracy-Related Penalty

Section 6662(a) imposes a penalty of 20 percent on any portion of an underpayment of tax that is attributable to negligence or disregard of rules or regulations. See sec. 6662(a) and (b)(1). "Negligence" is defined as any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and the term "disregard" includes any

careless, reckless, or intentional disregard. See sec. 6662(c). A position with respect to an item is attributable to negligence if it lacks a reasonable basis. See sec. 1.6662-3(b)(1), Income Tax Regs. Moreover, taxpayers are required to keep adequate books and records sufficient to establish the amount of deductions or other items required to be shown on their returns. Failure to maintain adequate books and records or to substantiate items properly also constitutes negligence. See id.

Section 6664(c)(1) provides that the penalty under section 6662(a) shall not apply to any portion of an underpayment if it is shown that there was reasonable cause for the taxpayer's position with respect to that portion and that the taxpayer acted in good faith with respect to that portion. See sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and good faith within the meaning of section 6664(c)(1) is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs.

Generally, the duty of filing accurate returns cannot be avoided by placing the responsibility on a tax return preparer. See Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987). Although a taxpayer remains liable for a deficiency attributable to a return prepared by an accountant, a taxpayer who supplies a qualified tax return preparer with all relevant information and who reasonably and in good faith relies on the preparer's advice is not negligent and has not disregarded rules or regulations,

even if the advice is incorrect and results in a deficiency.  See
Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d
1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

Petitioners provided all of their records to their
accountant.  Since petitioners' Schedule C loss was allowed after
the audit for taxable year 1987, the accountant continued
treating it as a business without question to petitioners.  We
find that petitioners reasonably and in good faith relied on
their accountant's advice.  Therefore, we hold that petitioners
are not liable for the accuracy-related penalty for the year at
issue.

To reflect the foregoing,

Decision will be entered

under Rule 155.